AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
3/19/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ____MMC____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
3/19/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ____tsn____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

United States of America

v.

ALEJANDRO SOLIS,

Defendant.

Case No. 2:25-MJ-01616-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, Christopher Sinclair, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of March 17, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This amended criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Christopher Sinclair, Special Agent
*Complainant's signature*

Christopher Sinclair, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 19, 2025

*Judge's signature*

City and state: Los Angeles, California

Hon. Stephanie Christensen, U.S. Magistrate Judge
*Printed name and title*

AUSA: Joshua J. Lee – (213) 393-5645

**AFFIDAVIT**

I, Christopher Sinclair, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Alejandro SOLIS ("SOLIS") for a violation of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance).

2. This affidavit is also made in support of an application for search warrant for:

    a. a gray TCL cellular telephone, as further described in Attachment A, which was located on the front passenger seat of SOLIS's car on March 17, 2025, and is currently in the custody of Burbank Police Department in Burbank, California (the "SUBJECT DEVICE").

3. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute or possess with intent to distribute a controlled substance).

4. Attachments A and B are incorporated herein by reference.

5. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and

1

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF SPECIAL AGENT CHRISTOPHER SINCLAIR

6.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since April 2020.  I am currently assigned to the DEA's High Intensity Drug Trafficking Area Group 42, which investigates large-scale drug trafficking organizations.

7.   During my time with the DEA, I have received 640 hours of narcotics law enforcement training while attending the DEA Basic Agent Training at the DEA Academy in Quantico, Virginia.

8.   I have investigated drug trafficking and drug trafficking organizations.  These investigations involved (1) the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of drugs (including cocaine, heroin, fentanyl, methamphetamine, and marijuana); (2) the laundering of drug proceeds and monetary instruments derived from drug trafficking activities; and (3) conspiracies to traffic controlled substances.  I am familiar with the methods drug traffickers use to conceal profits and launder proceeds of narcotics transactions.  I am also experienced in the use of tracking devices, conducting surveillance, interviewing

witnesses, writing affidavits for and participating in the execution of search warrants, and working with undercover agents, cooperating defendants, and confidential sources.

### III. SUMMARY OF PROBABLE CAUSE

9. On March 17, 2025, Burbank Police Department ("BPD") officers attempted to conduct a traffic stop of SOLIS. SOLIS immediately fled from the officers and a car chase ensued. Eventually, SOLIS parked, got out of his car, removed a duffle bag from his car and placed the bag in a trashcan before being arrested by BPD. The duffle bag contained approximately 20 pounds of methamphetamine.

### IV. STATEMENT OF PROBABLE CAUSE

A.  BPD Encountered SOLIS

10. Based on my review of law enforcement reports, conversations with other law enforcement officers, review of BPD video footage, and my own knowledge of the investigation, I am aware of the following:

   a. On March 17, 2025, at approximately 9:08 p.m., uniformed BPD Officer Owen Maus ("Officer Maus") was working patrol near the intersection of Hollywood Way and Alameda Avenue in Burbank, California. Officer Maus saw a silver Kia Soul ("silver Kia"), bearing California license plate no. 9GPJ984, directly in front of Officer Maus's patrol vehicle. Officer Maus saw that the silver Kia's license plate light was not working, in a violation of California Vehicle Code Section 24252(a).

    b. Officer Maus activated his emergency lights and attempted to stop the car at a nearby gas station, located at 200 North Hollywood Way, Burbank, California.  However, as the silver Kia entered the parking lot, it quickly accelerated and fled from BPD at a high rate of speed.  Due to the silver Kia's high speeds and reckless disregard for other motorists, Officer Maus followed the car from a safe distance and requested support from the BPD Air Support Unit ("Air Unit").

    c. Moments later, an Air Unit arrived and maintained aerial surveillance on the silver Kia and directed ground BPD patrol units to the silver Kia's location.  The Air Unit saw the car stop in the parking lot of a shopping center, located at 10941 Ventura Boulevard in Studio City.  The Air Unit saw a single occupant, later identified as SOLIS, exit the driver's side of the car.  At this time, the Air Unit saw SOLIS struggle to remove a large duffle bag from the passenger area of the car.  Unfortunately, at this time, due to the wide orbit of the Air Unit and the overhang of the shopping center's sidewalk, the Air Unit lost sight of SOLIS and was unable to see where SOLIS placed the duffle bag.

    d. Moments later, the Air Unit saw SOLIS running northwest through the parking lot without the duffle bag.  SOLIS returned to the silver Kia for a short period of time only to exit the car and run southeast on the shopping center's sidewalk.  BPD patrol cars began to arrive at the shopping center parking lot.  Officer Maus approached SOLIS's silver Kia to find it unoccupied.  BPD Officers Cameron Rossi and John Alas

saw SOLIS running, chased SOLIS, and eventually arrested him and took him into custody.

      e.    After SOLIS was taken into custody, BPD officers and the Air Unit conducted a search of the immediate area surrounding SOLIS's silver Kia. Office Maus saw a trashcan directly in front of SOLIS's car. A search of that trashcan revealed a black Adidas duffle bag containing approximately 20 gallon-sized bags of a clear crystal-like substance, consistent with methamphetamine.

      f.    BPD officers conducted a search of SOLIS's car. Inside the car, officers found a long cylindrical pipe under the driver's seat. Based on my training, experience, and knowledge of this investigation, the pipe was drug paraphernalia.

      g.    Additionally, officers seized the SUBJECT DEVICE from the front passenger seat of the car. The phone's display was on, showing directions to a location in Bakersfield, California.

      h.    Officer Maus read SOLIS his <u>Miranda</u> rights. SOLIS acknowledged and understood each right by responding "yes, sir." After SOLIS acknowledged and understood his rights, SOLIS admitted he fled from police because he did not have a driver's license and was currently on parole.

      i.    BPD Officers Jose Plascencia, Henry Vega, and Maus transported SOLIS to the BPD jail where he was processed and taken into custody for violations of California Vehicle Code Section 2800.2(a): felony reckless evading; California Health and Safety Code Sections 11379(a) and 11364(a): transportation

or sale of methamphetamine and criminal possession of drug paraphernalia, respectively; and California Penal Code Section 148(a)(1): willfully resist, delay, or obstruct a public officer.

    B.    **Review of the Shopping Center's Security Cameras**

11. On March 18, 2025, BPD Detective Tim Murphy ("Det. Murphy") spoke with the landlord of the shopping center, located at 10939 Ventura Boulevard in Studio City, where SOLIS was arrested. Det. Murphy requested security footage from the landlord.

12. On that same date, the landlord sent Det. Murphy security footage from the shopping center. The security footage showed SOLIS parking the silver Kia in the shopping center parking lot. The footage also showed SOLIS removing a bag from the car and placing the bag inside the trashcan, which was where BPD officers eventually found the duffle bag full of methamphetamine. Immediately after, the footage showed SOLIS running out of view of the security camera only to return moments later. When SOLIS returned, he was trying to access the passenger's door of the car, which appeared to be locked. SOLIS then ran to the driver's side door to get inside the car. Seconds later, SOLIS exited the car and ran out of the view of the camera.

    C.    **SOLIS's Interview on March 18, 2025**

13. On March 18, 2025, BPD Detective Corey Chefalo ("Det. Chefalo") and Detective Pietro Pira ("Det. Pira") interviewed SOLIS while in BPD custody. Prior to the interview, Det.

Chefalo asked SOLIS if he remembered his Miranda rights that he was advised of the night before. SOLIS stated that he remembered his Miranda rights. SOLIS admitted to taking the bag out of the car. Det. Chefalo asked SOLIS if he was given the drugs. SOLIS said he was just asked to pick up what he picked up.

### D. TruNarc Analyzer

14. On March 18, 2025, Det. Pira analyzed the crystal-like substance seized from the black duffle bag on March 17, 2025. Due to the large number of bags, detectives randomly picked three samples from the duffle bag to analyze using the "TruNarc" handheld narcotics analyzer. The "TruNarc" analyzer is a device used for presumptive testing in the field. The "TruNarc" analyzer identified the crystal-like substance as methamphetamine. The gross weight of the seized methamphetamine was approximately 20 pounds.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

15. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

        b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

        c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

    e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

16. As used herein, the term "digital device" includes the SUBJECT DEVICE.

17. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, <u>inter alia</u>, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   18.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus,

often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    19.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition

function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SOLIS's thumb and/or fingers on the device; and (2) hold the device in front of SOLIS's face with his  eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    20.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///
///
///

## VII. **CONCLUSION**

21. For all of the reasons described above, there is probable cause to believe that Alejandro SOLIS has committed a violation of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance). Additionally, there is probable cause to believe that the items to be seized listed in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19th day of
March, 2025.

_____
HON. STEPHANIE CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE

13